J-A26011-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| M.W., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| S.C.W., | |
| Appellee | No. 468 MDA 2014 |

Appeal from the Order Entered February 10, 2014
In the Court of Common Pleas of Luzerne County
Civil Division at No(s): 15087 OF 2010

BEFORE:  BOWES, MUNDY, and JENKINS, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED NOVEMBER 18, 2014**

M.W. ("Mother") appeals from the February 10, 2014 order wherein the Court of Common Pleas of Luzerne County denied her petition for permission to relocate to Tennessee with the parties' son, C.W.  We affirm.

We summarize the relevant factual and procedural history of this case as follows.  C.W. was born in March of 2007, during the marriage of Mother and S.C.W. ("Father").  On August 1, 2010, Mother and Father separated, and Father moved out of the marital residence.  The parties, without court intervention, agreed upon a custody arrangement whereby Mother exercised primary physical custody, and Father exercised partial physical custody on alternating weekends and one weekday visit per week.  The custody arrangement continued until June 5, 2012, when Mother filed with the Luzerne County Children and Youth Services ("CYS") a report of suspected

child abuse by Father. Specifically, Mother alleged that, on June 4, 2012, S.C.W. "inserted his finger inside [C.W.]'s buttocks and also touched [C.W.]'s penis" while the two were sharing a bathroom in Father's home. Opinion and Order, 2/10/14, at ¶ 22. Following an investigation, CYS filed an indicated report substantiating the abuse allegations.[1] However, Father successfully appealed that finding to an administrative law judge, and on October 1, 2013, his record regarding the indicated report was expunged.

Meanwhile, on August 13, 2012, Mother filed a custody complaint wherein she requested sole legal and sole physical custody of C.W. based on the then-pending indicated report. Following a custody conciliation conference before a master, the trial court, by interim order dated September 20, 2012, granted Mother sole legal and primary physical custody. The court granted Father supervised visitation and telephone contact on the following conditions:

4. Prior to commencing supervised visitation and telephone contact, the minor child shall be evaluated by Valley Counseling or if that counselor is unavailable, Jeffrey Fremont, with participation by either parent as requested by the evaluator, to

---

[1] The Child Protective Services Law ("CPSL"), 23 Pa.C.S. § 6301, *et seq*. defines an "Indicated report" as: "A child abuse report made pursuant to this chapter if an investigation by the county agency or the Department of Public Welfare determines that substantial evidence of the alleged abuse exists based on any of the following: (1) Available medical evidence; (2) the child protective service investigation; (3) an admission of the acts of abuse by the perpetrator." 23 Pa.C.S. § 6303. Child abuse is substantiated if the report is either indicated (agency determination) or founded (judicial adjudication). ***See id***.

- 2 -

assess whether it is detrimental or hazardous to the child to participate in professionally supervised contact with his father during the pendency of Department of Public Welfare review. Report and recommendation from the professional to be provided to counsel and the Master within thirty (30) days with costs shared between parties.

5. Following receipt of the professional evaluation, and if recommended by professional, the father, . . . , shall have supervised physical custody of his minor child, to be supervised by Lisa Bauman for two (2) hours or longer taking place either weekly or bi-weekly at the father's discretion. The father shall contact Lisa Bauman, M.S. . . . within seven (7) days of the professional's recommendation, in order to make the necessary arrangements for supervised visits. . . .

Interim Order, 9/20/12, at ¶¶ 4-5. In addition, the order included a provision directing that, if either party wished to relocate with the minor child, he or she must obtain the written consent of any individual who has custody rights or court approval "following . . . mandatory advance notice and consent/objection documentation."[2] *Id*. at ¶ 10.

Both parties filed exceptions to the master's recommendation and interim order, and a hearing was scheduled for December 13, 2012. There is no indication in the record that an evidentiary hearing occurred. Rather, on December 13, 2012, the trial court issued the following agreed-upon order, in relevant part:

[A]fter an off record discussion with the attorneys for the parties, the Court issues the following Order:

_____

[2] We note that the Honorable Chester A. Muroski, S.J., presided over all of the proceedings in the underlying matter.

> Prior to commencing supervised visitations and telephone contact, the minor child, and each party shall meet with Melanie A. Swencki, LSW, CHHC, to assess whether it is detrimental or hazardous to the child to participate in professionally supervised contact between the child and the father during the pendency of the Department of Public Welfare review.

Order, 12/13/12.

On August 30, 2013, Father filed a petition for modification of the interim order dated September 20, 2012, wherein he requested to resume contact with C.W. The trial court scheduled a custody conference, which, after multiple continuances, was scheduled for February 11, 2014. Eleven days later, Father filed a petition for contempt wherein he alleged Mother violated the September 20, 2012 interim order by relocating with C.W. to Tennessee without the written consent of Father or court approval. He also requested attorneys' fees. The trial court directed Mother to file a petition for relocation by January 1, 2014, and directed held Father's petition for contempt in abeyance until the relocation hearing.

On December 31, 2013, Mother filed a notice of proposed relocation, wherein she alleged that she relocated with C.W. to Thompson Station, Tennessee on August 4, 2013. In addition, she filed a separate petition to modify the existing custody order. Specifically, she desired to maintain her award of primary physical custody, and requested that C.W. be evaluated by a professional before contact resumed between him and Father. On January 22, 2014, Father filed a counter-affidavit in which he objected to the relocation.

- 4 -

On January 24, 2014, the trial court convened an evidentiary hearing to address Mother's petition for relocation. Mother testified during the hearing, and she presented her friend and housemate, J.L., and Melanie Swencki. The latter two witnesses testified by telephone. Father testified on his own behalf and presented his fiancée, M.B., and her grandmother G.G. On February 10, 2014, the trial court denied Mother's petition for permission to relocate. The court directed Mother to return C.W. to Luzerne County within twenty days.

Additionally, the court directed the parties to appear at the custody conference and master's hearing on February 11, 2014, as previously scheduled. The court then directed the master to determine, if possible, Mother's intention to return to Pennsylvania with C.W. and to recommend a custody order depending upon that decision. The court also directed the master to immediately facilitate contact between Father and C.W. and to recommend professional intervention, if necessary. Finally, the court awarded Father's attorney counsel fees in the amount of $1,000. The court issued an opinion accompanying the order wherein it set forth findings of fact and expressly considered the relocation factors pursuant to 23 Pa.C.S. § 5337(h).[3]

_____

[3] Section 5337(h) enumerates ten factors a court must consider in determining whether to grant a proposed relocation:

*(Footnote Continued Next Page)*

*(Footnote Continued)* ————————————————

(h) *Relocation factors.*--In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.
(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

*(Footnote Continued Next Page)*

On February 12, 2014, Mother filed a motion with the trial court to stay portions of the order pending appeal. Specifically, Mother requested that she be granted until May 25, 2014, to return C.W. to Luzerne County, so that he could complete his first-grade school year in the Williamson County School District in Tennessee, and so that Mother, a school teacher, could complete her employment contract for the 2013-2014 school year. Further, Mother requested that, until May 25, 2014, the parties schedule appointments with a counselor for Mother, Father, and C.W., to prepare for the resumption of contact between Father and C.W. On March 3, 2014, the trial court granted Mother's motion provided that she complies with the remaining terms and conditions. The court directed that Mother, Father, and C.W. engage in counseling and therapy in anticipation of resuming contact between Father and C.W. It also directed that Mother propose a professional located in Luzerne or Lackawanna County to perform the counseling and therapy, and if she failed to do so, or if the court did not approve the professional, then the court directed that counseling would be provided by Dr. Megan Velo-Zori in Wilkes-Barre, Luzerne County. Moreover, the court directed that the parties comply with the professional's

*(Footnote Continued)* ─────────────

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337(h).

recommendation concerning the schedule of contact between Father and C.W.

On March 7, 2014, Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).[4]

On appeal, Mother presents the following issues for our review:

1. When deciding Mother's Petition to Relocate and Modify an Existing Custody Order, did the trial court commit an error [of] law by not analyzing the custody factors, 23 Pa.C.S. § 5328(a), to determine the best interest of [C.W.]?

2. Did the trial court [err] by making findings, conclusions and statements throughout its opinion that are not supported by the evidence of record or that the trial court err[ed] by not explaining the underlying reasons for its findings, conclusions and statements[?]

3. Did the trial court [err] by failing to give appropriate weight to the testimony and report of the sole expert witness, Melanie A. Swencki, by taking it out of context and selectively editing it to form false impressions of her opinion?

4. Does the evidence of record support a conclusion of law that Mother met her burden of proof pursuant to 23 Pa.C.S.

---

[4] Mother appealed from the February 10, 2014 order denying her petition to relocate with C.W. When the trial court entered that order, the parties anticipated an additional proceeding, albeit unrelated to relocation, that had been previously scheduled for February 11, 2014. That proceeding occurred as scheduled. Generally, a custody order is considered interlocutory if further proceedings are contemplated when it is entered. *See* **G.B. v. M.M.B.**, 670 A.2d 714 (Pa.Super. 1996). However, since the previously scheduled proceeding did not address relocation and, in fact, occurred prior to the date Mother filed her notice of appeal from the order denying relocation, the instant appeal is not interlocutory.

§ 5337(i)(1) by establishing that relocating [C.W.] to Tennessee is in his best interest[?]

5. Does the evidence of record support a conclusion of law that Mother met her burden of proof pursuant to 23 Pa.C.S. § 5337(i)(2) by establishing the integrity of her motives in seeking the relocation?

6. Does the evidence of record support a conclusion of law that Father met his burden of proof mandated in 23 Pa.C.S. § 5337(i)(2) by establishing the integrity of his motives in seeking to prevent the relocation?

7. Did the trial court's disdain for [CYS] penalize Mother for protecting [C.W.] by reporting an allegation of sexual abuse committed by Father against [C.W.]?

8. Did the trial court commit an error of law by ordering [C.W.] [to] be returned to Luzerne County when the Father did not request primary physical custody of [C.W.]?

9. Did the trial court err[] by awarding Father's attorney, John Bellino, counsel fees in the amount of one thousand dollars ($1000.00) as a penalty when the opinion is silent as to any bas[i]s for the award and no evidence was presented as to the reasonableness of expenses and fees charged?

Mother's brief at 1-3.[5]

The scope and standard of review in custody matters is well-established:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court

---

[5] We have reordered Mother's issues for ease of disposition.

is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

**R.M.G., Jr. v. F.M.G.**, 2009 PA Super 244, 986 A.2d 1234, 1237 (Pa.Super. 2009) (quoting **Bovard v. Baker**, 2001 PA Super 126, 775 A.2d 835, 838 (Pa.Super. 2001)). Moreover,

[O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.

The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

**R.M.G., Jr., supra** at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. **Ketterer v. Seifert**, 2006 PA Super 144, 902 A.2d 533, 539 (Pa.Super. 2006).

**A.V. v. S.T.**, 87 A.3d 818, 820 (Pa.Super. 2014).

The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being." **Saintz v. Rinker**, 902 A.2d 509, 512 (Pa.Super. 2006) (*citing* **Arnold v. Arnold**, 847 A.2d 674, 677 (Pa.Super. 2004)).

In her first issue, Mother argues that the trial court committed an error of law by failing to analyze the statutory best interest factors pursuant to 23 Pa.C.S. § 5328(a).[6] Specifically, Mother asserts that she "requested a

---

[6] 23 Pa.C.S. § 5328(a) enumerates the following factors that a trial court must consider in determining the best interests of a child when awarding any form of custody:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

*(Footnote Continued Next Page)*

modification of the current custody order in the event the relocation was granted." Mother's brief at 17. Further, she asserts that the court should have considered the § 5328(a) factors "if the trial court anticipated any modification to the current custody order which awarded the Mother primary physical custody and sole legal custody. . . ." *Id*. at 16. For the following reasons, we find no error.

*(Footnote Continued)* ————————

> (9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.
>
> (10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.
>
> (11) The proximity of the residences of the parties.
>
> (12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.
>
> (13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.
>
> (14) The history of drug or alcohol abuse of a party or member of a party's household.
>
> (15) The mental and physical condition of a party or member of a party's household.
>
> (16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

Recently, in **M.O. v. J.T.R.**, 85 A.3d 1058 (Pa.Super. 2014), this Court held that a trial court need not address the § 5328(a) custody factors in modifying a custody order, so long as the modification does not affect the type of custody award. In that case, the parties had resolved their custody dispute except for a single, narrow issue, namely, whether the father would be required to be off from work during three of his five weeks of his summer custodial vacation time. As such, the parties presented limited testimony at the custody hearing related to this single issue. This Court affirmed the trial court's order, directing that the father need not take off from work during the three weeks of his custodial time even though the trial court did not expressly consider the § 5328(a) custody factors. In **M.O.**, we concluded that § 5328(a) did not apply because the order "did not make an award of custody, but merely modified a discrete custody-related issue." **M.O.**, 85 A.3d at 1063.

In contrast, in **A.V.**, **supra**, this Court held that the trial court erred by failing to apply the § 5328(a) custody factors when making a new award of custody. In that case, the order granted the petition to relocate filed by the mother. In addition, the order included a provision entitled "partial custody" which gave the father partial physical custody on alternating weekends, thereby changing his physical custody award from "shared physical custody" to "partial physical custody" and reducing his custodial time.

Unlike the order in **A.V.**, **supra**, the February 10, 2014 order did not affect either parties' custody rights. Moreover, the March 3, 2014 order in

this case did not make an award of custody. Rather, like the order in **M.O.**, *supra*, it modified the terms of the September 20, 2012 interim order by directing a new professional to provide counseling and therapy to C.W. and to recommend a schedule of contact between C.W. and Father. Thus, Father's partial custody award has not changed, and the court was not required to consider the § 5328(a) custody factors.

Additionally, the record reveals that the parties agreed in this case that the January 24, 2014 hearing before the trial court related to Mother's relocation request only, and that the custody master would preside over their custody dispute in the near future. Specifically, the trial court granted a motion filed by Father for an expedited hearing on Mother's petition to relocate and modify the custody order by scheduling the hearing for January 24, 2014. At that time, however, a "record hearing" was already scheduled before a custody master for February 11, 2014, with respect to Father's petition to modify the interim custody order, filed on August 30, 2012.

At the conclusion of the testimony on January 24, 2014, the trial court on the record in open court determined that the issue of custody was not before it. The following excerpts from the relocation hearing are instructive.

> [Father's counsel]: Judge, I'm confused. We haven't done anything with custody on our part.
>
> [The Court]: Well, you're asking for modification of custody.
>
> [Father's counsel]: That's to be addressed next week. We have a record hearing. That's why I said this is only a relocation case,

- 14 -

and I thought you agreed with that throughout this whole case. Next week, we have that issue.

N.T., 1/24/14, at 274. Mother's counsel did not object to the hearing involving relocation only. In fact, she implicitly agreed with the position of Father's counsel by subsequently stating on the record in open court, "Well, I think, Judge, . . . we're going to need the direction of this Court as to your findings on relocation." *Id*. The trial court responded by promising to "have that done in time for your [custody] hearing. . . ." *Id*.

Mother's counsel then requested on the record in open court that Mother be permitted to testify by telephone at the scheduled custody hearing before the master. *Id*. at 274-275. Father's counsel opposed the request for Mother to testify by telephone rather than in person, and the trial court responded to Father's counsel, "Let's get real. You know darn well that Father is not to do anything above some points of contact with [C.W.]. No way, no how at this point in time is there going to be a transfer of custody." *Id*. at 275. The court continued,

> [T]herefore, I don't think that it's completely necessary for [Mother] to be present. My understanding is if somebody doesn't like what happened at that hearing, if you get that far, that hearing would be before the Court.
>
> . . . .
>
> So, I would have the opportunity and I would insist that she be present if we ever got that far.

*Id*.

Based on the foregoing unique procedural posture of this case, when the parties agreed that the trial court hearing on January 24, 2014 related to Mother's relocation request only, and the subject order did not address physical custody, we reject Mother's argument that the court erred by not considering the § 5328(a) custody factors.

We next consider whether the trial court abused its discretion in its application of the § 5337(h) relocation factors that we outlined in footnote three on page six. As the party proposing relocation, Mother has the burden of proving that relocation will serve C.W.'s best interests as set forth under § 5337(h). *See* 23 Pa.C.S. § 5337(i)(1). In addition, "[e]ach party has the burden of establishing the integrity of that party's motives in either seeking the relocation or seeking to prevent the relocation." 23 Pa.C.S. § 5337(i)(2).

We review Mother's following issues together as they are interrelated. In her second issue on appeal, Mother argues the court's findings with respect to § 5337(h)(1) and (5) are not supported by the record. In her third issue, she argues the court erred by failing to give appropriate weight to Ms. Swencki's testimony and report, and by taking her testimony out of context and forming false impressions of her opinion. Mother argues in her fourth issue that she has met her burden of proof pursuant to § 5337(i)(1), that the relocation to the State of Tennessee will serve C.W.'s best interests pursuant to § 5337(h). Similarly, in her fifth and sixth issues, Mother argues she has met her burden of proof with respect to the integrity of her

motives in seeking the relocation, and Father has not met his burden of proof in seeking to prevent the relocation pursuant to § 5337(i)(2). Specifically, Mother argues the trial court's findings with respect to § 5337(h)(8), *i.e.*, the reasons and motivation of each party for seeking or opposing the relocation, are not supported by the record.

The trial court found as follows with respect to the aforementioned subsections. As it relates to the nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the non-relocating party, the court found:

> Although Mother was the primary caretaker prior to the unauthorized relocation, Father, prior to the allegations of June, 2012, had regular and liberal contact with [C.W.], enjoying periods of partial custody, including overnights and weekends.

> This Father has been removed from [C.W.]'s life since June 4, 2012, approximately twenty (20) months, based on one report of alleged sexual abuse without any kind of trial. . . . [A] loving bond existed between Father and [C.W.] before June, 2012. Such relationship is now in jeopardy and is in need of extensive rehabilitation, which is further hampered by the unauthorized relocation of Mother with [C.W.] to Tennessee and Father remaining in Luzerne County. Although [C.W.] has no siblings, he has been completely removed and prevented from having any physical contact with his grandparents, aunt and uncle. . . .

Trial Court Opinion, 2/10/14, at 9.

The testimonial and record evidence supports the court's findings that, before Mother made the allegation against Father on June 5, 2012, Father exercised partial custody, and he and C.W. shared a loving bond. In fact, Father testified that he is originally from the State of New York, that he lived and worked in New York when he began dating Mother, and that he

- 17 -

continued to work in New York during approximately the first three years of the parties' marriage. N.T., 1/24/14, at 195-197. Thereafter, Father obtained employment at Misericordia University, near the family home in Wilkes-Barre, Luzerne County. *Id*. at 199-200. The parties separated approximately one year after Father began his employment at the university, and Father testified he chose to remain residing in Luzerne County for the following reason:

> [Mother] consistently said, Hey. Are you going back to New York? Why don't you go back to New York? All your friends are there. Why don't you go back to New York?
>
> It was very, very important for me to stay local. I could have gone back to New York. I could have easily gotten my old job back . . ., but it was important for me to stay local and stay close to my [s]on and maintain that relationship.

*Id*. at 205.

The record demonstrates that Father adamantly denied Mother's allegation of "child abuse" from the very beginning and throughout the underlying custody matter. Nevertheless, at the time of the subject proceedings, Father had not seen C.W. since his pre-school graduation on June 7, 2012, two days after Mother notified CYS of the suspected "child abuse." *Id*. at 227-228. Father testified that a CYS caseworker interviewed him on June 6, 2012, with respect to Mother's allegations. He asked the caseworker for permission to attend C.W.'s pre-school graduation the next day, and he and Mother had arranged that C.W. would go home with him after the graduation. *Id*. at 226-227. The CYS caseworker allowed Father

to attend the graduation, but not to take C.W. home with him. *Id*. at 228. Father explained, "So, that is why I was at that graduation . . .; and, at that graduation, [C.W.] is in my arms asking me to take him home. This is after the allegation took place." *Id*.

Further, to the extent Mother argues that the record does not support the court's finding that C.W. has been removed from the regular physical contact with his maternal relatives, we disagree. Mother's own testimony contradicts this contention in that she acknowledged on cross-examination that all of her relatives, including her mother, father, sister, and brother-in-law, reside in Wilkes-Barre, Luzerne County, and that they saw C.W. regularly. *Id*. at 109-110.

With respect to § 5337(h)(5), addressing a parent's attempt to thwart the child's relationship with the other party, the court found:

> Mother has taken every opportunity to interfere with and thwart any relationship that existed between Father and [C.W.]. Her unauthorized relocation with [C.W.], without the written consent of Father or even the approval of the Court, is the clearest and most compelling evidence to substantiate that fact. Mother, fully aware that Father adamantly contested the indicated finding and took any and all steps necessary to overcome the allegations to clear his name, took it upon herself to remove herself and [C.W.] from the jurisdiction of this Court. The persistent and undeterred actions of Father to fight the allegations and to resume his relationship with [C.W.], undeniably sets forth his intention and desire, and only motive, to promote and reestablish his relationship with [C.W.].

*Id*. at 11.

There is no evidence in the record that Mother had complied with the September 20, 2012 interim order directing her to have C.W. evaluated by

the counselor for reuniting with Father. Further, Mother testified on cross-examination that she relocated with C.W. to Tennessee in early August of 2013, without Father's consent or the court's approval. N.T., 1/24/14, at 120-121.

The December 13, 2012 order provided that the parties shall meet with Ms. Swencki, "to assess whether it is detrimental or hazardous to the child to participate in professionally supervised contact between the child and the father" during the pendency of Father's appeal of the indicated report. Interim Order, 12/13/12. Ms. Swencki testified that she met with Father one time in December of 2012, pursuant to this agreed-upon interim order. Ms. Swencki explained that she advised Father not to have supervised visitation with C.W. until Father's appeal of the indicated report concluded in order to avoid "[g]rounds for people to say that you influenced [C.W.] in some way." N.T., 1/24/14, at 172-173. Alternatively, Ms. Swencki told Father that, if the allegations were true, "then you could retraumatize" C.W. by participating in supervised visitation. *Id*. Ms. Swencki testified that she told Father to "go home and think about it and see how you want to pursue this and let me know." *Id*. at 173.

Father informed Ms. Swencki that he would do "[w]hatever [C.W.] wanted to do. If [C.W.] wanted to see me, then I would facilitate that. If [C.W.] did not want to see me, then I would not. . . . I would not do – ever do anything to harm my son." *Id*. at 211. Father's testimony continued on direct examination,

- 20 -

Q. Did you think you're not seeing [C.W.] was in his best interest?

A. At the time, I mean, I wanted to see my son, but I was waiting for the Court to say one way or the other[.] [W]hat I thought was happening was I thought Melanie Swencki was going to give a report to the Court on what she thought should happen; and, then the Court was going to tell me, okay, we're going to set up these supervised visits. That's what I thought was going to happen. I have been screaming from the rooftops that I want to see my son for a year and a half.

*Id*. at 211-212. As such, Father never contacted or met with Ms. Swencki again.

With respect to Mother's argument that the court took the testimony of Ms. Swencki out of context, we disagree. Specifically, Mother asserts the record does not support the court's finding that Ms. Swencki encouraged Father not to see C.W. The foregoing evidence belies Mother's assertion.

In addition, Mother asserts that the record does not support the court's finding that C.W. told Ms. Swencki that "he was only joking" about his statement to CYS regarding Mother's allegation, and that C.W. stated he was not fearful of Father. *See id*. at ¶ 37. We disagree.

The following facts are relevant to our determination. Ms. Swencki acknowledged on cross-examination that, in her most recent interview with him, C.W. indicated that he would not be fearful to visit Father.[7] *See* N.T., 1/24/14, at 181. Further, Ms. Swencki acknowledged on cross-examination

---

[7] Ms. Swencki met with C.W. on four occasions. N.T., 1/24/14, at 162.

that C.W. told her that he was joking with respect to his conversation with CYS regarding the allegations.[8] However, Ms. Swencki also testified that, in the same interview, C.W. recanted his statement to her that the account he provided to CYS was a joke. *Id*. at 182. To the extent the trial court made determinations on the credibility and weight of Ms. Swencki's testimony regarding what C.W. had stated to her, we will not disturb it. *See A.V.*, 87 A.3d at 820 (stating that we defer to the trial court with respect to credibility and weight determinations). As the record supports the trial court's finding regarding C.W.'s statements, we will not disturb it, even though a reasonable mind could interpret the testimony differently and reach the opposite conclusion. Thus, no relief is due.

Further, contrary to Mother's assertion, we will not disturb the court's findings with respect to § 5337(h)(2), *i.e.*, the age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child. Specifically, Mother challenges the court's conclusion that she ignored C.W.'s special need for "a full evaluation by a specialist in the field of childhood sexual trauma," as recommended by Ms. Swencki. Order and Opinion, 2/10/14, at 10. We discern no abuse of discretion by the court. Indeed, Ms. Swencki testified

_____

[8] The record is devoid of any statements by C.W. to CYS.

that, at the hearing on December 13, 2012, she recommended C.W. receive treatment from a counselor, other than her, on sexual abuse. N.T., 1/24/14, at 177, 189-190. The testimonial evidence demonstrates that Mother failed to follow Ms. Swencki's advice in this regard. *Id*. at 86-89. As such, Mother's second and third issues fail.

Turning to Mother's fourth, fifth, and sixth issues, the crux of her argument is that the court abused its discretion with respect to the following findings relating to § 5337(h)(8):

> It is abundantly clear that the sole purpose of the unauthorized relocation by Mother with [C.W.] was totally for the sole reason of preventing Father from reestablishing and/or resuming any relationship with [C.W.]. Father on the other hand seeks the return, or if given the opportunity, to prevent the relocation, of [C.W.] to engage in whatever treatment is deemed necessary so as to expand on the loving relationship which existed in the past.

Trial Court Opinion, 2/10/14, at 13.

The testimonial evidence supports the court's findings. Mother testified that she was employed as a teacher at the Solomon Plains Junior High School in the Wilkes-Barre Area School District in the 2012-2013 school year, but that she considered it "a very hostile work environment," and that this was the primary reason she relocated with C.W. to Tennessee. N.T., 1/24/14, at 44-45, 133. Mother explained that, because of the changing demographics of the school, she started a multi-cultural club. She testified that some teachers "who were harboring racist sentiments, came up with a nickname for me," namely, "Nigger lover." *Id*. at 46. Mother testified on

cross-examination that she never told any school authorities or filed any complaints with respect to the hostile work environment. *Id*. at 98-99. As a result of the alleged hostile work environment, Mother testified she started to look for a new position in the summer of 2013. *Id*. at 47-48. Significantly, however, Mother testified on cross-examination that, when she moved to Tennessee in early August of 2013, without Father's consent or court approval, she did not have a job offer. *Id*. at 120-123. Mother testified that, since relocating to Tennessee, she and C.W. live on the second floor of a home owned by her female friend, J.T., who resides in the same home with her two teenage children.[9] *Id*. at 56-59. Hence, the record confirms that Mother quit her long-term position in Wilkes-Barre area school district to follow a friend of two years to Tennessee. Moreover, assuming that Mother's justification for the move was sincere, nothing in the certified record indicates that Mother had a legitimate reason to forgo seeking the court's permission before relocating her son to another state.

In addition, with respect to § 5337(h)(6), *i.e.*, whether the relocation will enhance the general quality of life for the party seeking relocation, and § 5337(h)(7), *i.e.*, whether the relocation will enhance the general quality of

---

[9]  J.T. testified during the relocation hearing that she has known Mother for more than four years because Mother taught her children at Solomon Junior High School. J.T. testified that she and Mother have been friends for over two years. Further, J.T. testified that she had resided in Luzerne County for 45 years, but relocated to Tennessee with her children in June of 2013, for a job promotion. N.T., 1/24/14, at 142-144.

life for the child, the trial court found that Mother failed to establish that the quality of either her life or C.W.'s life would be enhanced. Rather, the court found that the quality of their lives has been diminished in that they moved from a single family home occupied only by them "to take up residence on the second floor of a dwelling owned by a friend, sharing the kitchen area with another family." Opinion and Order, 2/10/14, at 12. Further, the court found that Mother's current salary as a teacher in the Williamson County School District, in Williamson County, Tennessee, is $6,000 less than her salary was in the Wilkes-Barre Area School District, and that all of Mother's extended family resides in Luzerne County. *Id*.; *see also* N.T., 1/24/14, at 50, 100. The court also found that C.W. "has been ripped from any and all physical contact of his grandparents, aunt and uncle, which he enjoyed on a regular basis prior to the unauthorized relocation undertaken by Mother." Opinion and Order, 2/10/14, at 12. The evidence sustains the court's findings.

Based on the foregoing, we discern no abuse of discretion by the court in concluding that, contrary to Mother's assertions, she has failed to satisfy her burden of proof that the relocation to Tennessee will serve C.W.'s best interests pursuant to § 5337(h) and her burden of proof regarding the integrity of her motives in seeking the relocation. Further, we discern no abuse of discretion by the court in concluding that Father has met his burden of proof in seeking to prevent the relocation. Thus, Mother's fourth, fifth, and sixth issues fail.

In her seventh issue, Mother argues the trial court "has such an antagonistic and contemptuous attitude" toward CYS as a result of the manner in which CYS conducted its investigation of her allegation, that the court was unable to render a fair and impartial judgment in this relocation matter. We disagree.

In its opinion and order, the court articulated its belief that CYS did not conduct a proper investigation of Mother's allegation because, in part, CYS interviewed Father only once and failed to interview his fiancée, who was home at the time of the alleged incident. *See* Opinion and Order, 2/10/14, at 13-15. Contrary to Mother's assertion, we discern no such "antagonistic and contemptuous attitude" by the trial court against CYS. To the extent the court commented on CYS's investigation, it did so in light of its conclusion that Mother has intentionally interfered with Father's parental rights. Based on our thorough review of the record, we conclude that the order denying her permission to relocate is not a result of an unfair or partial judgment by the court in any regard. Thus, Mother's seventh issue fails.

In her eighth issue, Mother argues the trial court committed an error of law in ordering that C.W. be returned to Luzerne County when Father did not request an award of primary physical custody. Mother implies that because she has primary physical custody and now resides in Tennessee, C.W. should have been permitted to remain in Tennessee. Mother's argument fails. While the trial court ordered that Mother return C.W. to Pennsylvania, it did not direct her to relinquish custody to Father. Thus,

- 26 -

assuming Mother returns to Pennsylvania with the child, she would retain primary custody under the prevailing custody arrangement. However, if Mother declines to return to the Commonwealth with her son, the trial court would be required to conduct a full-scale custody proceeding and draft a comprehensive § 5328(a) analysis to determine whether Father, or anyone else, is entitled to maintain custody of the child in Pennsylvania.

In her final issue, Mother argues the court erred by awarding Father's counsel attorney fees in the amount of $1,000. Specifically, Mother argues that Father did not request an award of attorney fees or present any evidence with respect to his attorney fees. We discern no abuse of discretion by the court as Father filed a petition for contempt on September 10, 2013, with respect to Mother's relocation with C.W. wherein he requested attorney fees, and the court heard this petition at the same time as Mother's petition for relocation. Section 6337(j)(4) authorizes trial courts to award counsel fees when a relocating parent fails to provide the non-relocating parent reasonable notice of the proposed move. Although our review of the certified record reveals that Father did not adduce any evidence to establish the amount of his attorney fees, we conclude that the $1,000 award is reasonable in light of Mother's underhanded conduct in intentionally relocating without the court's permission.

Based on the foregoing, we affirm the custody order denying Mother's request to relocate with C.W. to Tennessee and directing that C.W. be returned to Luzerne County, a new professional provide counseling to C.W.,

and the same professional recommend a schedule of contact between C.W. and Father, in this case where the parent-child relationship has been denied for a period of twenty months.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/18/2014